**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| YP RECOVERY INC., an Illinois Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-3428 |
| | ) | |
| YELLOWPARTS EUROPE, SL, a Spanish Company; | ) | |
| YELLOWPARTS SL, a Spanish Company; YELLOW | ) | |
| RENT SL, a Spanish Company; PINTURA Y | ) | |
| REPARACIONES WORK SL, a Spanish Company; | ) | |
| JUAN JOSE JORGE SEBASTIA, an individual; | ) | |
| JOSE MARIA CHILET, an individual; and | ) | |
| MARK DREXLER, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendants YellowParts Europe SL, YellowParts SL, Yellow Rent SL, Pintura Y Reparaciones Work SL, Juan Jose Jorge Sebastia, Jose Maria Chilet, and Mark Drexler (collectively, "Defendants") have moved the Court to dismiss the Amended Complaint of Plaintiff YP Recovery, Inc. (R.30). Defendants move to dismiss on four grounds: (1) insufficient service of process under Federal Rule of Civil Procedure 12(b)(5); (2) lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1); (3) lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2); and (4) failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court now considers Defendants' Rule 12(b)(1) challenge. For the following reasons, the Court grants Defendants' motion and dismisses this case without prejudice to Plaintiff's ability to pursue its claims in the proper court.

# BACKGROUND

This case concerns a business dispute between several foreign companies regarding the procurement and shipment of heavy construction equipment from Europe to Africa. According to Plaintiff YP Recovery, Inc. ("YP Recovery"), Defendants induced it and its agents to transfer $700,000 to Defendant YellowParts Europe SL ("YP Europe") and Defendant YellowParts SL ("YPSL") (together, "Yellow Parts") based on promises to deliver heavy machinery to Cameroon and Ghana and to create a joint venture entity called "Locam Yellow Parts" (the "JVCo"). (R.6, Compl. ¶¶ 37, 41, 52-53, 57, 60, 63). Plaintiff brings claims for (i) fraudulent inducement, (ii) fraud, (iii) unjust enrichment, and (iv) conspiracy to commit fraud arising out of Defendants' alleged misstatements. (*See id.*).

## I. The Parties

Plaintiff YP Recovery purports to bring this action as assignee of two companies, (i) Diamond International, Inc. ("Diamond"), and (ii) Locam Global, Inc. ("Locam"). (R.6-2, Assignment of Rights). YP Recovery is an Illinois corporation with its principal place of business in Illinois. (R.6, Compl. ¶ 1). Diamond is an Illinois corporation with its principal place of business in Illinois. (*Id.* ¶ 17). Locam is a Cameroonian company with its registered office in Yaoundé, Cameroon. (*Id.* ¶ 18). Diamond, Caterpillar International, and the United States Trade and Development Agency ("USTDA") sponsored Locam in its corporate formation. (*Id.*). Ms. Beatrice Tayui ("Tayui") signed the assignment instrument as "President" of Diamond, "Agent & Representative" of Locam, and "Director" of YP Recovery. (R.6-2, Assignment).

Defendants YP Europe, YPSL, Yellow Rent SL ("Yellow Rent"), and Pintura Y Reparaciones Work SL ("Pintura SL") are Spanish companies with registered offices in Valencia, Spain. (R.6, Compl. ¶¶ 5-8, 10). Defendants Juan Jose Jorge Sebastia ("Sebastia")

and Jose Maria Chilet ("Chilet") are citizens of Spain and residents of Valencia, Spain. (*Id.* ¶¶ 2-3, 11). Sebastia is the Managing Director of YP Europe, sole proprietor of YPSL, sole administrator of Yellow Rent, and joint administrator and manager of Pintura SL. (*Id.* ¶¶ 5-8). Chilet is the Management Assistant of YP Europe. (*Id.* ¶ 5). Defendant Mark Drexler ("Drexler") is a United States citizen purportedly "domiciled in the state of Florida [who] currently resides in Spain." (*Id.* ¶¶ 4, 12). Drexler is an International Sales Consultant for YP Europe. (*Id.* ¶ 5).

## II.    The Joint Venture Negotiations

The following facts guide the Court's determination on Defendants' Rule 12(b)(1) motion. The Court may consider evidence outside of the pleadings in analyzing this factual challenge. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009).

### A.    Meeting In Spain (September 2012)

During a July 2012 business trip to Africa on behalf of Yellow Parts, Sebastia met Mr. Joe Biney ("Biney") of MJ Limited ("MJL").[1] (R.31-1, Sebastia Decl. ¶¶ 9-10). Biney, in turn, introduced Sebastia to Mr. Christian Ibeagha ("Ibeagha"), who informed Sebastia that he worked for a "Cameroonian company called Locam" which was "looking to acquire heavy equipment for shipment to Cameroon." (*Id.* ¶ 11). Sebastia suggested that Yellow Parts "might be able to help" and offered to continue business discussions once he returned to Spain. (*Id.* ¶¶ 12-13). Sebastia then asked Drexler to conduct the negotiations on Yellow Parts' behalf because he was its International Sales Consultant and he spoke fluent English. (*Id.* ¶ 14; R.6, Compl. ¶ 37).

The parties continued discussions throughout August 2012. In particular, they discussed equipment orders, potential deal structures (including equity participation, agency establishment,

---

[1] MJL is a Ghanaian limited liability company with its principal place of business in Accra North, Ghana. (R.6, Compl. ¶ 20).

and direct sales), and a potential meeting in Valencia, Spain.  (R.6-3, Aug. 2012 E-mail Correspondence between Drexler and Ibeagha, attached as Exhibit B to the Compl.).  Ultimately, the parties agreed to meet in Valencia in September.  Ibeagha sent Drexler travel itineraries reflecting that he would arrive from Madrid with Biney, while Locam representative Zacharie Mbajon ("Mbajon") and Tayui would arrive from Paris.  (R.35-1, Ibeagha Decl. Ex. 1C-1D, Aug. and Sept. 2012 E-mail Correspondence). Tayui's itinerary, in particular, reflected her initial departure city as Chicago, Illinois.  (*Id.*).

From September 12-16, 2012, Ibeagha, Tayui, Mbajon, Biney, Drexler, and Sebastia met "to discuss Yellow Part's role in providing machinery to Locam."  (R.35-1, Ibeagha Decl. ¶ 9). At the beginning of this meeting, the attendees exchanged business cards.  (R.38-1, Supp. Drexler Decl. ¶ 6).  Tayui's card—provided to Drexler— identified her as "Locam Global President/CEO, 980 North Michigan Avenue, Chicago, Illinois 60611."  (R.38-1, Supp. Drexler Decl. Ex. A).  According to Tayui, in "all stages of the discussions and negotiations between Locam and Yellow Parts regarding the creation of the [JVCo.]," she "notified all parties that [she] was acting both in [her] capacity as agent and director of Locam and in [her] capacity as agent, director, and president of Diamond International."  (R.35-2, Tayui Decl. ¶¶ 7-8).  Sebastia and Drexler deny this, each averring, "I do not know who or what Diamond International is. Yellow Parts did not conduct any negotiations with, or receive any correspondence from, Diamond International during the negotiations of the deal to supply heavy machinery to Africa." (R.31-1, Sebastia Decl. ¶ 21; R.31-2, Drexler Decl. ¶ 35; R.38-1, Supp. Drexler. ¶¶ 5-7).

Ultimately, the September 2012 meeting attendees decided to structure the deal between Locam, MJL, and Yellow Parts as an equity partnership.  (R.35-1, Ibeagha Decl. ¶ 10).  Pursuant to that understanding, Drexler agreed to send "a list of machines and prices" that Yellow Parts

would "be able to source for the first phase of Locam Global." (R.35-1, Ibeagha Decl. Ex. 1E, Sept. 19, 2012 E-mail from Drexler to Ibeagha, Tayui, Mbajon, and Biney).

## B.    Meeting In Ghana (January 2013)

In January 2013, the parties again met—this time in Ghana—to discuss forming a new company called "Locam Yellow Parts." (R.35-1, Ibeagha Decl. ¶ 12). Ibeagha, Sebastia, Drexler, Chilet, and Biney attended this meeting. (*Id.*; R.31-3, Chilet Decl. ¶ 10). According to the meeting minutes, the attendees discussed business opportunities, timelines, funding, equipment, and capital structure for the contemplated JVCo. (R.6-6, Jan. 22, 2013 Meeting Minutes). The parties deferred, however, any questions related to "ownership (costs and profit sharing included)" or "final structure" to Tayui. (*Id.*; R.35-1, Ibeagha Decl. ¶ 13). According to Tayui, she was "predominantly responsible for answering, discussing, and negotiating issues related to the financing of the new JVCo., and for the structure of the JVCo." (R.35-2, Tayui Decl. ¶ 9).

In February 2013, Locam prepared and circulated a draft Memorandum of Agreement for a Joint Venture Company ("JV Agreement"). (R.31-2, Drexler Decl. ¶ 27; R.35-1, Ibeagha Decl. ¶ 14). Drexler subsequently provided "feedback and suggestions to the draft agreement from Locam." (R.31-2, Drexler Decl. ¶ 27; R.35-1, Ibeagha Decl. ¶¶ 15-16). In the course of these dealings, Locam changed the total proposed capital investment from $3 million to $2 million, with Locam contributing $1 million and MJL and Yellow Parts each contributing $500,000. (R.31-2, Drexler Decl. ¶ 28 and Ex. B thereto).

On May 17, 2013, Ibeagha e-mailed the parties a final version of the JV Agreement, informing them of the plan "to sign these at the HQ of Locam in Chicago [the first] week of July – July 1st to 5th inclusive." (R.35-1, Ibeagha Decl. Ex. 1I, May 17, 2013 E-mail). On May 30,

Drexler sent Ibeagha an e-mail advising that he was "ready to go with the Project . . . All we need is funding" and inquiring, "What do we need to do to get the money so we can close the deals we have and get these machines on a ship?  I would love to be sitting with all of you in Chicago on July 5th drinking mojitos knowing that the ship is on its way to [Cameroon] with $2,000,000 worth of machines."  (R.6-8, May 30, 2013 E-mail).

On June 5, 2013, Ibeagha asked Biney to "please arrange to transfer the [available] funds to Mark and Yellow [P]arts to the address below.  [Advise] what [is] transferred and Madam [Tayui] will make the rest transfer from Chicago."  (R.6-9, June 5, 2013 E-mail).  Biney subsequently advised Drexler that "the funds are lodged in an off shore account."  (R.31-2, Drexler Decl. Ex. C).  On June 17, Biney sent Drexler a transfer message indicating that he had wired $700,000 from his account at Ecobank, the Pan African Bank.  (*Id.* Ex. D).

According to Tayui, however, the $700,000 did not originate from Locam.  (R.35-2, Tayui Decl. ¶ 13).  Rather, she transferred the funding—which "came predominantly from a USTDA grant and from Diamond International"—in order "to fund the JVCo."  (*Id.* ¶¶ 13-14).  Diamond, therefore, was "ultimately the company that suffered the loss of the $700,000."  (*Id.* ¶ 15).  The Complaint allegations, too, reflect that the $700,000 originated from Diamond and passed through Locam, ultimately reaching Defendants.  (R.6, Compl. ¶¶ 46-47, 52, 53, 56, 60).

Upon receipt of the $700,000 wire from Ecobank via Biney, Yellow Parts "contributed capital of its own in excess of its $500,000 commitment and began acquiring and preparing the machinery that Locam had requested."  (R.31-2, Drexler Decl. ¶ 32).

### C.   Meeting In Illinois (July 2013)

According to Sebastia and Drexler, the "first time" they heard the name "Diamond International" in the course of business dealings was in June 2013 – when "Locam told [them]

that the Chicago meeting would be held at Diamond International Headquarters on July 3, 2013."

(R.31-1, Sebastia Decl. ¶¶ 20-23; R.31-2, Drexler Decl. ¶¶ 33-35). Drexler and Sebastia

nonetheless traveled to Chicago to attend the July 3, 2013 meeting. (*Id.*). During the course of

that meeting, Ibeagha, Mbajon, Tayui, Biney, Sebastia, and Drexler discussed business

opportunities, shipment and port details, and JVCo. details, including establishing a board of

directors and formulating a mission statement. (R.35-1, Ibeagha Decl. ¶¶ 20-24).[2] They also

"reviewed, amended, and signed" the JV Agreement. (*Id.*). The JV Agreement was "intended to

set up a framework for article of association / shareholders agreement and to be valid to

commence operations until articles of operations are reflective of [the] new JVCo. and

finalization of the shareholders agreement." (R.38-1, Supp. Drexler Decl. Ex. B, Final JV

Agreement at Art. VII). Only YP Europe, Locam, and MJL are parties to the JV Agreement.

(*Id.*). The JV Agreement makes no mention of Diamond International. (*Id.*). Despite the

intention of the JV Agreement, the signatories neither created the JVCo. nor signed any articles

of association or shareholders agreement. (R.35-1, Ibeagha Decl. ¶ 27). According to Ibeagha,

Yellow Parts has failed to deliver any machinery to Africa, and has failed to return the $700,000.

(*Id.* at ¶¶ 28-29). Yellow Parts, meanwhile, has $1.2 million worth of equipment sitting in its

yard. (R.31-1, Sebastia Decl. ¶ 19).

## LEGAL STANDARD

The standard the Court employs on a Rule 12(b)(1) motion to dismiss for lack of subject

matter jurisdiction depends on the purpose of the motion. *See Apex Digital*, 572 F.3d at 443-44;

*United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc),

---

[2] Ibeagha states that Chilet also attended the Chicago meeting. (R.35-1, Ibeagha Decl. ¶ 20). The Complaint, however, makes no mention of Chilet attending the Chicago meeting – only Sebastia and Drexler. (R.6, Compl. ¶¶ 48-49). Chilet, moreover, denies attending the meeting, and Sebastia and Drexler make no mention of Chilet accompanying them there. (R.31-3, Chilet Decl. ¶ 10).

*overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).

If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction,

the Court must accept all well-pleaded factual allegations as true and draw all reasonable

inferences in favor of the plaintiff. *See Silha v. ACT, Inc.,* 807 F.3d 169, 173 (7th Cir. 2015);

*Apex Digital*, 572 F.3d at 443-44. If, however, the defendant denies or controverts the truth of

the jurisdictional allegations, the Court may look beyond the pleadings and view any evidence

submitted to determine if subject matter jurisdiction exists. *See Apex Digital*, 572 F.3d at 443-

44; *United Phosphorus*, 322 F.3d at 946; *see also St. John's United Church of Christ v. City of*

*Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). "Where jurisdiction is in question, the party

asserting a right to a federal forum has the burden of proof, regardless of who raises the

jurisdictional challenge." *Craig v. Ontario Corp.*, 543 F.3d 872, 876 (7th Cir. 2008).

## ANALYSIS

Under Rule 12(b)(1), a court must dismiss a claim if it lacks subject-matter jurisdiction

over it. *See State of Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) ("Subject-

matter jurisdiction is the first question in every case, and if the court concludes that it lacks

jurisdiction it must proceed no further"). Defendants now move to dismiss the Complaint on

Rule 12(b)(1) grounds, arguing that diversity of citizenship does not exist, and, thus, the Court

lacks subject matter jurisdiction. The diversity statute—28 U.S.C. § 1332—provides, in part,

that:

> **(a)** The district courts shall have original jurisdiction of all civil actions where the matter
> in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is
> between
>
> > **(1)** citizens of different States;
> >
> > **(2)** citizens of a State and citizens or subjects of a foreign state, except that the
> > district courts shall not have original jurisdiction under this subsection of an
> > action between citizens of a State and citizens or subjects of a foreign state who

are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

(**3**) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(**4**) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a). "When a plaintiff sues more than one defendant in a diversity action, the plaintiff must meet the requirements of the diversity statute for *each* defendant or face dismissal." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 829, 109 S. Ct. 2218, 2221 (1989) (emphasis in original). The Court now considers whether this case fits into any of Section 1332(a)'s jurisdictional grants.

## I. Jurisdiction Is Not Proper Under 28 U.S.C. § 1332(a)(1)

Plaintiff alleges that the Court "has original jurisdiction due to diversity of citizenship under 28 U.S.C. § 1332(a)(1)." (R.6, Compl. ¶ 14). As Defendants observe, however, this case does not concern "citizens of different States." *See* 28 U.S.C. § 1332(a)(1); *see also Newman-Green*, 490 U.S. at 828 ("In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State"). Here, Defendants YP Europe, YPSL, Yellow Rent, Pintura SL, Sebastia, and Chilet are citizens of Spain. Defendant Drexler, meanwhile, is a United States citizen who—contrary to the Complaint's allegations—is domiciled in Spain. In other words, Drexler intends to "remain and reside in Spain indefinitely." (R.38-1, Supp. Drexler Decl. ¶ 4). *See Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir. 2002) ("domicile is the place one intends to remain"). Drexler, thus, is not a "citizen of a State" within the meaning of Section 1332(a)(1). *See Newman-Green*, 490 U.S. at 828; *Buchel-Ruegsegger v. Buchel*, 576 F.3d 451, 455 (7th Cir. 2009) ("an American

citizen who moves abroad is not a citizen of any state for purposes of § 1332(a)(1)"). Plaintiff, therefore, has improperly invoked federal jurisdiction under Section 1332(a)(1).

## II. Given Drexler's Status, Jurisdiction Is Not Proper Under 28 U.S.C. § 1332(a)(2) or 28 U.S.C. § 1332(a)(3)

Defendant Drexler's "stateless" status also destroys alternative theories of diversity jurisdiction. Here, as in *Newman-Green*, Plaintiff may not rely on Section 1332(a)(2) because that provision confers jurisdiction "when a citizen of a State sues aliens only." *See Newman-Green*, 490 U.S. at 828. Plaintiff cannot invoke this provision because Drexler is a United States citizen. *Id.* Plaintiff also cannot invoke Section 1332(a)(3)—which confers jurisdiction "when a citizen of one State sues both aliens and citizens of a State (or States) different from the plaintiff's"—because Drexler is "stateless" for purposes of Section 1332(a)(3) – that is, he has "no domicile in any State." *Newman-Green*, 490 U.S. at 828.

Recognizing this, Plaintiff asks the Court to drop Drexler as a party pursuant to Federal Rule of Procedure 21, enabling it to invoke jurisdiction under Section 1332(a)(2). Rule 21 provides that the "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. "[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." *Newman-Green*, 490 U.S. at 832. Here, no party argues that Drexler—as an individual Defendant—is indispensable to the lawsuit, or that any prejudice will stem from his dismissal. Accordingly, the Court grants Plaintiff's request and dismisses Drexler as a party under Rule 21. *See Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 420-21 (7th Cir. 2016) ("Stampley may therefore stay or go, as far as the joinder rules are concerned. Since his continued presence

destroys the district court's subject-matter jurisdiction, he is someone who should be dismissed under *Newman–Green*").

### III.     Identifying the Real Party In Interest for Diversity Purposes

Defendants next challenge Plaintiff YP Recovery's identity as the "real party in interest." The "real party in interest" inquiry "identifies what party's (or parties') citizenship should be considered in determining diversity." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 745, 187 L. Ed. 2d 654 (2014); *see also CCC Info. Servs., Inc. v. Am. Salvage Pool Ass'n*, 230 F.3d 342, 346 (7th Cir. 2000) ("the citizenship of the real party in interest is determinative when deciding whether the district court has diversity jurisdiction"); *N. Trust Co. v. Bunge Corp.*, 899 F.2d 591, 594 (7th Cir. 1990) ("the relevant citizens for diversity purposes must be real and substantial parties to the controversy"); *Nat'l Ass'n of Realtors v. Nat'l Real Estate Ass'n, Inc.*, 894 F.2d 937, 941-42 (7th Cir. 1990) (prohibition on collusive assignments "qualifies the principle that ordinarily the relevant citizenship for diversity purposes is that of the named plaintiff rather than that of the persons on whose behalf he is suing") (citations and quotations omitted); *Jennings v. Hill*, No. 05 C 0974, 2005 WL 1041327, at *1 (N.D. Ill. May 3, 2005) ("Federal diversity jurisdiction requires complete diversity between the real and substantial parties in interest").

According to Defendants, Locam is the real party in interest.  Because Locam is a citizen of Cameroon, Defendants reason, this case necessarily includes aliens on both sides, rendering diversity jurisdiction unavailable.  *See Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 626-27 (7th Cir. 1998) ("a suit between aliens falls outside § 1332's jurisdictional grant") (citing *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809)).  Moreover, even construing Diamond—an Illinois citizen—as a "real party in interest" alongside Locam, diversity

jurisdiction is still unavailable. As the Seventh Circuit has instructed, cases "in which one side of the litigation ha[s] *only* foreign parties and the other ha[s] a mixture of foreign and domestic parties . . . [do] not fit any of the possibly applicable jurisdictional pigeonholes." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 428 (7th Cir. 1993) (emphasis in original). Thus, Section 1332(a)(2), "when read in light of (a)(3), does not permit a suit between foreigners and a mixture of citizens and foreigners." *Id.*; *see also Israel Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 202 (7th Cir. 1994).

Plaintiff disputes that Locam is the real party in interest. According to Plaintiff, Locam and Diamond transferred an absolute interest in the litigation to named Plaintiff, YP Recovery, making *it* the real party in interest. Because YP Recovery is an Illinois citizen suing aliens, Plaintiff contends that jurisdiction is proper under Section 1332(a)(2). Even if the Court disregards the assignment, Plaintiff argues, Diamond—not Locam—is the real party in interest. The Court now addresses these arguments.

### A.    The Assignment of Rights

Defendants challenge the assignment of rights to YP Recovery as an unlawful attempt to manufacture federal court jurisdiction. In particular, 28 U.S.C. § 1359 provides that "a district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. As evidence of impropriety, Defendants point to several factors, including: (1) the timing of YP Recovery's corporate formation, less than ten days before the complaint filing, and one day after Locam's purported assignment; (2) the minimal consideration received by Locam for its assignment ($10); and (3) the overlapping identity of agents and representatives between and among YP Recovery, Locam, and Diamond.

###### i.     Applicable Legal Principles

It is well-settled that federal subject-matter jurisdiction "cannot be conferred by collusion or consent."  *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 589 F.3d 881, 886 (7th Cir. 2009) (citing 28 U.S.C. § 1359).  "When assignments of rights seem to have the effect of creating diversity jurisdiction, federal courts give them close scrutiny for signs of attempts to manipulate the choice of forum."  *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 723 (7th Cir. 2012).  This question is one of fact.  *See Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1066 (7th Cir. 1992) (citation omitted); *see also Boyd v. Phoenix Funding Corp.*, 366 F.3d 524, 531-32 (7th Cir. 2004) (analogizing 28 U.S.C. § 1446 to 28 U.S.C. § 1359, and remanding for factual findings related to whether "the assignment . . . was an innocent one in the ordinary course of business, or one designed to make removal possible").

"When considering whether a particular assignment was improperly made to manufacture diversity jurisdiction, a district court should consider the totality of the circumstances."  *Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1205 (10th Cir. 2014).  As the Tenth Circuit has observed, some of those circumstances include:

(1) Did the assignee lack a prior connection with the matter?

(2) Did the assignor select the assignee's attorney and pay the assignee's litigation expenses?

(3) Did the assignor retain control of the litigation?

(4) Did the assignee agree to pay the assignor a portion of any recovery?

(5) Did the assignee provide meaningful consideration for the assignment?

(6) Is the assignment's timing suspicious?

(7) Was the assignment motivated by a desire to create diversity jurisdiction?

*Id.* at 1205-06 (citations and quotations omitted); *see also Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 916-17 (8th Cir. 2015) (outlining similar factors). The Seventh Circuit has also suggested that such considerations apply when analyzing a Section 1359 challenge. *See Boyd*, 66 F.3d at 531-32 (relevant fact-finding may include the timing of the assignment, the relationship (if any) between the assignee and the assignor with respect to the underlying transaction and the assignment, and the overlap of attorney representation); *Travelers*, 689 F.3d at 723 (citing to *Airlines Reporting Corp. v. S and N Travel, Inc.*, 58 F.3d 857, 862 (2d Cir. 1995) for the "close scrutiny" standard); *Airlines Reporting*, 58 F.3d at 863 ("Several factors may be relevant in evaluating the reasons given for an assignment, although no single one will be dispositive"). Under Seventh Circuit precedent, however, no presumption of impropriety arises from an assignment between related entities. *See Herzog*, 976 F.2d at 1066-67 ("no inference of collusive invocation of jurisdiction can be drawn from the simple fact that assignor and assignee are under common ownership"). Nonetheless, *Herzog* does not preclude scrutiny of the assignment at issue "for signs of attempts to manipulate the choice of forum." *See Travelers*, 689 F.3d at 723.

Before analyzing the factual evidence, the Court must address a related issue. In particular, Plaintiff argues that "where a plaintiff submits a sworn affidavit giving a legitimate reason for the assignment of a right from a non-diverse company to an affiliated, diverse company, § 1359 does not apply and the underlying suit is properly diverse." (R.35, Response Br. at 11). Specifically, Plaintiff refers to Tayui's averment that the "primary purpose for creating YP Recovery, Inc. was to consolidate all of the claims Locam, Diamond International, Chris Ibeagha, and myself had against Yellow Parts." (R.35-2, Tayui Decl. ¶ 23). While the Court may not "disregard the sworn evidence" on this issue, *see Herzog*, 976 F.2d at 1067,

*Herzog* nowhere holds that "§ 1359 does not apply" whenever the plaintiff submits a sworn affidavit. To the contrary, *Herzog* invites district courts to consider counter-evidence and to render factual determinations. *See id.* at 1066-67; *see also DBD Franchising, Inc. v. DeLaurentis*, No. 09 C 669, 2009 WL 1766751, at *3 (N.D. Ill. June 23, 2009) ("*Herzog* instructs courts to make a factual determination of whether the assignment was collusive").

The affidavits submitted in *Herzog* and *DBD*, moreover, are dissimilar to Tayui's affidavit in this case. In *Herzog*, for example, a non-diverse, wholly-owned subsidiary of the plaintiff assigned two promissory notes to the plaintiff. Shortly after that assignment, the plaintiff brought suit to enforce those notes in federal court. Against a Section 1359 challenge, the plaintiff "submitted affidavits attesting that the purpose of the assignment was not to create diversity jurisdiction but to facilitate the provision of additional capital to [subsidiary-assignor], which needed it in its operations." Although the assigned promissory notes were of "dubious utility" since "they could be collected only by means of a lawsuit[,]" they had "some value . . . and therefore some utility as consideration for the capital that [the assignor] needed." *Herzog*, 976 F.2d at 1066-67.

Similarly, in *DBD*, the sole shareholders of two Illinois companies (i) transferred one company's state of incorporation to Wisconsin, and (ii) dissolved the other company and transferred its assets—a purchase agreement with the defendant—to a newly-incorporated Wisconsin company. *See DBD*, 2009 WL 1766751 at *1. Although the shareholders converted these companies, in part, "because they wanted the companies to enjoy the same benefit of diversity jurisdiction as they would receive in a suit against [the defendant]," *see id.*, they also attested to other motives. The shareholders, for example, "had physically moved to Wisconsin, were not conducting business in Illinois, and had intended to change their corporate status for

some time." *Id.* at *4. Both *Herzog* and *DBD*, thus, invoke an independent business purpose for the assignment, rather than a litigation-related rationale.

Here, considering the relative interests and citizenships of Locam and Diamond—specifically, Locam's chief interest as party to the JV Agreement and recipient of the alleged misrepresentations, and Diamond's more incidental interest as Locam's financial sponsor for the proposed business venture—the assignment of rights "seem[s] to have the effect of creating diversity jurisdiction[.]" *Travelers*, 689 F.3d at 723. This is especially true given that, had Locam and Diamond prosecuted their claims together as opposed to consolidating and assigning them, diversity jurisdiction would not exist. *See Allendale*, 10 F.3d at 428. Accordingly, the Court gives the assignment "close scrutiny for signs of attempts to manipulate the choice of forum." *Id.* As Defendants observe, absent such scrutiny, any foreign entity with a U.S.-based investor, shareholder, sponsor, affiliate, or partner could sue foreign parties in federal courts by assigning its claims, along with the incidental claims of its domestic sponsor, to a shell entity in the name of "consolidating" claims. (R.38, Reply Br. at 7).

### ii. Analysis

Prior Connection. The Court first examines YP Recovery's prior connection with this matter. As Defendants observe, YP Recovery was formed on April 8, 2015, nine days before it filed this lawsuit. (R.31-4, Corporation File Detail Report). Accordingly, it is undisputed that YP Recovery has no prior connection to this dispute, which arises from failed business negotiations throughout 2012-2013. *See Nat'l Ass'n of Realtors*, 894 F.2d at 941-42 ("If the real estate agents are the ones hurt by the defendants' conduct, they cannot by enlisting their association as their champion break out of the limits of the diversity jurisdiction"); *Nat'l Fitness*, 749 F.3d at 1206 ("Indeed, National Fitness didn't even exist when that dispute arose"). The

lack of a prior connection further distinguishes Plaintiff from the cases on which it relies. In *Herzog*, for example, the assignee had a prior connection to the promissory notes at issue, insofar as the parties had a pre-existing asset purchase agreement and disputed whether the notes constituted a prepayment under that agreement. *See* 976 F.2d at 1066; *see also Spartech Corp. v. Opper*, 890 F.2d 949, 954 (7th Cir. 1989) ("Having paid on Equipment's behalf some of the taxes that Equipment owed the state, Spartech was within its rights in suing the Oppers"). YP Recovery's insubstantial connection to this dispute points toward the improper creation of diversity jurisdiction. *See Betar v. De Havilland Aircraft of Canada, Ltd.*, 603 F.2d 30, 35 (7th Cir. 1979) ("The purpose of section 1359 is to limit consideration to cases that 'really and substantially' involve a dispute within the jurisdiction of the federal courts. Because the named plaintiff here has no stake in the outcome of the lawsuit, the use of his citizenship transforms an action between aliens to an action within the diversity jurisdiction").

Control of Litigation / Litigation Expenses. The Court next examines whether the assignors—Locam and Diamond—selected litigation counsel and retained control of the litigation. Here, Defendants observe that the corporate "agent" for YP Recovery is the attorney serving as its litigation counsel. (R.31-4, Corporation File Detail Report). In addition, Tayui signed the assignment in a representative capacity on behalf of all three companies – YP Recovery, Locam, and Diamond. (R.6-2, Assignment). Given this overlap, it is reasonable to infer that Tayui selected litigation counsel and is "calling the shots in this case." *See Nat'l Fitness*, 749 F.3d at 1206; *cf. Boyd*, 366 F.3d at 532 ("If Residential's counsel also represented both Homecomings and Bank One throughout the state court proceedings, then it seems unlikely that the three companies were acting independently in the litigation"). It appears, moreover, that YP Recovery has minimal independent business assets—if any—insofar as Tayui admits that its

"primary purpose" is to consolidate and assert the assigned claims in this litigation. (R.35-2, Tayui Decl. ¶ 23). *See also Branson*, 793 F.3d at 916 (considering "whether the assignee has any assets other than the assigned claim and has any business functions other than pursuing the litigation"). YP Recovery, which bears the burden of establishing jurisdiction, has set forth no evidence or argument to counter these inferences. *See United Phosphorus*, 322 F.3d at 946 ("The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction . . . And the court is free to weigh the evidence to determine whether jurisdiction has been established") (citation omitted).

Retention of Interest. The Court next inquires whether YP Recovery has agreed to pay its assignors a portion of any recovery. Here, Tayui has averred that "YP Recovery is not obligated to reimburse Diamond International or Locam any proceeds recovered under this litigation." (R.35-2, Tayui Decl. ¶ 24). While YP Recovery may not be "obligated" to reimburse its corporate affiliates, the Court is mindful of the reality that Tayui may have the authority to take any litigation proceeds out of YP Recovery's coffers. *See Nat'l Fitness*, 749 F.3d at 1207 ("we cannot shut our eyes to the reality that, should National Fitness prevail, nothing would prevent Stephenson from causing National Fitness to transfer the stock and the Grandview property back to himself"). The Court is not convinced, therefore, by Plaintiff's reliance on a footnote in *Kramer v. Caribbean Mills, Inc.*, which states, "we have no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively made,' regardless of the transferor's motive." *See* 394 U.S. 823, 828 n.9 (1969). Given the overlapping representation by Tayui, the Court cannot say that Locam and Diamond retain no

interest in the subject matter of this litigation. *See Nat'l Fitness*, 749 F.3d at 1208 ("Simply put, by virtue of being National Fitness's sole shareholder, Stephenson has a lot riding on this case").

Meaningful Consideration. It is uncontested that Locam only received $10 for its assignment. Defendants argue that such consideration "bears no relation to the damages claimed in this action." (R.31, Opening Br. at 11). Given YP Recovery's failure to rebut this contention, the Court agrees. This factor weighs toward impropriety.

Suspicious Timing. The timing of the assignment also supports a finding of impropriety. Locam and Diamond assigned their claims to YP Recovery on April 7, 2015. (R.6-2, Assignment). This date falls almost two years after Locam signed the JV Agreement, ten days before YP Recovery filed the complaint in this action, and (somehow) one day before YP Recovery's formal incorporation. (R.31-4, Corporation File Detail Report). Thus, "the timing of the assignment in relation to the parties' dispute and to this lawsuit . . . emit[s] an odor of collusion[.]" *Herzog*, 976 F.2d at 1067; *see also Nat'l Fitness*, 749 F.3d at 1207 ("We can hardly fault the district court for raising an eyebrow at this sequence of events").

Motive. As noted above, Tayui has averred that the "primary" motive for the creation of YP Recovery was to assert the consolidated claims of Locam and Diamond in this litigation. (R.35-2, Tayui Decl. ¶ 23). According to Defendants, however, "Diamond ha[d] nothing to contribute" insofar as it has no independent, viable claims under the law. (R.38, Reply Br. at 7). The Court agrees that, at bottom, the propriety of this assignment—and, therefore, the identity of YP Recovery as the real party in interest for diversity purposes—comes down to Diamond's role in this litigation. Accordingly, the Court analyzes Diamond's status as the "real party in interest."

## B. Diamond's Status

According to Plaintiff, Diamond is the real party in interest because Diamond is "the party that actually lost the money[.]" (R.35, Response Br. at 12). It is unclear, however, whether Diamond would be able to maintain an action in its own name, untethered from Locam. *See Weissman v. Weener*, 12 F.3d 84, 86 (7th Cir. 1993) ("because Weissman's injuries are all derivative—they derive from the fact that A.H.L. suffered a loss—he is not the real party in interest, and therefore cannot maintain an action in his own name"). The gravamen of the Complaint is that "Defendants induced Plaintiff and its agents, via Defendants' conduct and false promises, into sending funds in the amount of $700,000.00 in consideration for Defendants' promise to create the new JVCo and deliver the heavy machinery to Africa." (R.6, Compl. ¶ 53). Plaintiff does not contend that these promises were made to Diamond, as opposed to Locam. Indeed, as the Complaint makes clear, (i) Locam transferred the money to YPSL (*id.* ¶ 47); (ii) Locam maintained the Cameroon project requiring the heavy machinery (*id.* ¶ 37); and (iii) Locam signed the JV Agreement contemplating the creation of the JVCo. (R.38-1, Supp. Drexler Decl. Ex. B). Tellingly, Plaintiff itself urges that the JV Agreement—to which only Locam is party—is at the "center of this lawsuit[.]" (R.35, Response Br. at 15, 13). At most, Tayui avers that she negotiated with Defendants in her dual Locam/Diamond capacities—a disputed factual point—and that she "caused to be transferred $700,000 to Locam." (R.35-2, Tayui Decl. ¶¶ 7-8, 13-14).

Given the Complaint's allegations and the Rule 12(b)(1) record, the Court finds that Diamond's injuries, if any, derive from Locam's. In other words, they derive from Defendants' alleged failure to remit the $700,000 back to Locam, to deliver the machinery to Cameroon for Locam, and to create the JVCo. as contemplated under the JV Agreement signed with Locam.

Accordingly, Diamond is not the real party in interest. *See Weissman*, 12 F.3d at 86. Although the *Weissman* decision dealt with Federal Rule of Civil Procedure 17(a), *see id.*, there is a "rough symmetry between the 'real party in interest' standard of Rule 17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 476 n.9 (1980); *see also Wilsey v. Eddingfield*, 780 F.2d 614, 615 (7th Cir. 1985). Plaintiff has failed to address either standard in view of Defendants' "derivative injury" arguments, and, therefore, has failed to meet its burden as the party invoking federal court jurisdiction. *See Jennings*, 2005 WL 1041327 at *1 (citing *Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir. 1997); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 237 (7th Cir. 1995)).

Given this finding and the factual circumstances outlined above, the Court deems the purported assignment of claims to be improper. *See* 28 U.S.C. § 1359. Looking only to Locam's citizenship as the real party in interest, *see CCC Info.*, 230 F.3d at 346, diversity jurisdiction does not exist because "a suit between aliens"—that is, between a Cameroonian plaintiff and Spanish defendants—"falls outside § 1332's jurisdictional grant." *See Karazanos*, 147 F.3d at 626-27. Accordingly, the Court grants Defendants' Rule 12(b)(1) motion and dismisses this case without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' Rule 12(b)(1) motion and dismisses this case without prejudice to Plaintiff's ability to pursue its claims in the proper court.

**Dated:** September 1, 2016

_____
**AMY J. ST. EVE**
**United States District Court Judge**